BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
Alan R. Plutzik (aplutzik@bramsonplutzik.com) (Cal. Bar No. 077785)
2125 Oak Grove Road, Suite 120
Walnut Creek, California  94598
Telephone: (925) 945-0200
Facsimile:  (925) 945-8792

E filing

FILED

DEC 10 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

IZARD NOBEL LLP
Robert A. Izard (rizard@izardnobel.com)
Mark P. Kindall (mkindall@izardnobel.com) (Cal. Bar No. 138)
29 South Main Street, Suite 215
West Hartford, CT 06107
Telephone: (860) 493-6292
Facsimile:  (860) 493-6290

HARWOOD FEFFER LLP
Robert I. Harwood (rharwood@hfesq.com)
James G. Flynn (jflynn@hfesq.com)
Tanya Korkhov (tkorkhov@hfesq.com)
488 Madison Avenue
New York, NY 10022
Telephone: (212) 935-7400
Facsimile: (212) 753-3630

*Attorneys for Plaintiff Ruben Romero and the Class*

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

C12-6260 PSG

RUBEN ROMERO, on behalf of himself, the Nokia
Retirement Savings and Investment Plan and a class
of persons similarly situated,

:
:
:
:

**CLASS ACTION**

Plaintiff,

v.

NOKIA, INC., NOKIA RETIREMENT SAVINGS
AND INVESTMENT PLAN COMMITTEE, LINDA
FONTENEAUX, BILLIE HARTLESS, BRIAN
MILLER, ARTO SIRVIO, MARIO VIAMIN, BOB
BURNS, DENISE DOYLE, KATE HARMON,
SUSAN MCFARLANE, CHRIS WEBER, OLIVER
PUECH, TODD D. LEITSTEIN, and BENJAMIN C.
ADAMS,

Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

COMPLAINT UNDER THE
EMPLOYEE RETIREMENT
INCOME SECURITY ACT
(ERISA) FOR BREACH OF
FIDUCIARY DUTY

**ORIGINAL**

1    Plaintiff Ruben Romero ("Plaintiff") individually, as a representative of the Nokia

2   Retirement Savings and Investment Plan (the "Plan") and, to the extent appropriate, on behalf of

3   a class of similarly situated participants in the Plan (the "Participants"), by his attorneys, alleges

4   the following for his Complaint ("Complaint"):

5                        **NATURE OF THE ACTION AND SUMMARY OF CLAIMS**

6    1.    Plaintiff, a Participant in the Plan, brings this action concerning Plan investments

7   in shares of American Depository Receipts ("ADRs") of Nokia Corporation ("Nokia" or "the

8   Company"), individually, as a representative of the Plan and, to the extent appropriate, on behalf

9   of a class of all Participants in the Plan for whose individual accounts the Plan invested in the

10  Nokia Stock Fund (the "Fund"), from January 19, 2012 through and including the present (the

11  "Class Period"). Plaintiff brings this action against the fiduciaries of the Plan pursuant to

12  § 502(a)(2) and (3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.

13  § 1132(a)(2) and (3).

14   2.    As more fully set forth below, Defendants breached their fiduciary duties owed to

15  the Plan and the Participants, including those fiduciary duties set forth in ERISA § 404, 29

16  U.S.C. § 1104, and Department of Labor Regulations, 29 C.F.R. § 2550. As a result of these

17  breaches, Defendants are liable to the Plan for all losses resulting from each such breach of

18  fiduciary duty. Plaintiff also seeks equitable relief.

19   3.    Plaintiff alleges that, from the beginning and throughout the Class Period, it was

20  imprudent to permit (1) the Plan to offer the Fund as an investment option, (2) the Plan to invest

21  in the Fund, and (3) the Fund to invest in, and remain invested in, ADRs of Nokia Corporation

22  ("Company Stock"), because objective, public information revealed that the Fund and Company

23  Stock were extremely risky investments which were imprudent for the investment of retirement

24  assets. Specifically, Nokia's financial condition – as set forth in detail below – had deteriorated

25  to the point that, by the start of the Class Period, Defendants knew or should have known that the

26  Company was in "dire circumstances," and that therefore the Plan's assets should not be

27  subjected to the extraordinary risks posed by the Company's stock.

28

1    4.      In addition to the imprudent investment claims, Plaintiff further alleges that those

2    Defendants who had a duty to appoint and monitor the fiduciaries with authority or control over

3    the management or disposition of the Plan's assets breached their duty to appoint and monitor.

4    5.      Plaintiff alleges that each Defendant is also liable as a co-fiduciary.

5    **JURISDICTION AND VENUE**

6    6.      Plaintiff's claims arise under and pursuant to ERISA § 502, 29 U.S.C. § 1132.

7    7.      This Court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29

8    U.S.C. § 1132(e)(1).

9    8.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C.

10   § 1132(e)(2), because this is the district where the Plan is administered, and where one or more

11   Defendants reside or may be found.  Nokia's Form 11-K, filed on June 27, 2012 ("2012 Form

12   11-K") with the Securities and Exchange Commission ("SEC"), lists the address of the Plan as

13   200 S. Mathilda Avenue, Sunnyvale, CA 94086, which, upon information and belief, is the place

14   where the Plan is administered.   Previously, upon information and belief, the Plan was

15   administered at 102 Corporate Park Drive, White Plains, New York.

16   **THE PARTIES**

17   **The Plaintiff**

18   9.      Plaintiff Ruben Romero was a participant in the Plan and maintained an

19   investment in the Nokia Stock Fund in his individual Plan account during the Class Period.

20   **Nokia, Inc.**

21   10.     Defendant Nokia, Inc. ("Nokia U.S.") is a corporation incorporated under the

22   laws of the State of Delaware. Nokia U.S. is a wholly-owned subsidiary of Nokia, a corporation

23   incorporated and headquartered in Finland.  Defendant Nokia U.S.'s principal place of business

24   in the United States, as well as that of the Plan, is 200 S. Mathilda Avenue, Sunnyvale, CA

25   94086.  Previously, Nokia U.S. was located at 102 Corporate Park Drive, White Plains, New

26   York.

27

28

**The Committee**

11.     Defendant Nokia Retirement Savings and Investment Plan Committee (the "Committee") is an unincorporated association of the Company.  The Committee's members performed all of the duties of the Committee.  The Committee and its members are hereinafter referred to as the "Committee."

12.     Nokia's 2012 Form 11-K, lists Defendant Linda Fonteneaux as the Plan Administrator of the Plan.

13.     Defendants Billie Hartless, Brian Miller, Arto Sirvio ("Sirvio"), Mario Viamin ("Viamin"), Bob Burns, Denise Doyle, Kate Harmon, and Susan McFarlane were the individual members of the Committee during some or all of the Class Period alleged herein.

**The Board of Directors Defendants**

14.     Defendants Chris Weber, Oliver Puech, Todd D. Leitstein, Benjamin C. Adams, Sirvio and Viamin (collectively, "Board Members") were members of Defendant Nokia U.S.'s Board of Directors during some or all of the Class Period alleged herein.  The Board Members had the duty to appoint and monitor the Committee and the Plan trustee, Fidelity Management Trust Company ("Fidelity" or "Trustee").  According to Article 8.01 of the Plan, the members of the Committee "serve at the pleasure of, the Board of Directors or any officer of the Company."

## DESCRIPTION OF THE PLAN

15.     At all times relevant to this Complaint, the Plan was an employee benefit plan within the meaning of ERISA § 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

16.     At all times relevant to this Complaint, the Plan was a "defined contribution" or "individual account" Plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provided for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which could be allocated to such Participant's accounts.

17.     The stated purpose of the Plan was to permit Nokia U.S. "to share its profits with its employees and to provide for the accumulation of funds for the benefit of eligible employees

COMPLAINT UNDER THE EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA) FOR BREACH OF FIDUCIARY DUTY

1   and their beneficiaries in the manner and to the extent set forth in such plan." Plan at 1.

2   Similarly, according to the SPD provided to Participants to educate them about the Plan, the Plan

3   "was established to help provide greater security for you and your family." SPD at 1. The

4   Plan's investment policy statement likewise provided that "[t]he objective of the Plan is to help

5   participants in accumulating savings to achieve financial security upon retirement." The Nokia

6   Retirement Savings and Investment Plan Investment Policy Statement, revised as of February

7   2011 ("Investment Policy"), at 1.

8        18.    Another purpose of the Plan was that it be managed in accordance with the

9   interests of participants and beneficiaries. According to the SPD, "[t]he people who operate your

10   plan, called 'fiduciaries' of the plan, have a duty to do so prudently and in the interest of you and

11   the other participants and beneficiaries." SPD at 17. *See also* Plan Art. 8.02(a).

12        19.    At all times relevant to this Complaint, the Plan provided that Participants could

13   direct no less than 1% and no more than 50% of eligible compensation into the Plan. Plan Art.

14   3.01(a).

15        20.    Defendant Nokia U.S. also made matching contributions to in an amount equal to

16   100% of Participant voluntary contributions up to 6% of eligible compensation. Plan Art. 3.03.

17   Nokia U.S. could also make additional matching contributions at its discretion. Plan Art.

18   3.03(a). The purpose of the matching contributions was to "encourage participation and long-

19   term savings." SPD at 4.

20        21.    The Plan provided that the "Committee" would designate investment options for

21   the investment of the assets in Participant Plan accounts. Plan Art. 5.03. Participants could

22   direct the investment of their Plan accounts among the investment options in 1% increments.

23   Plan Art. 5.02(a).

24        22.    One of the Plan's investment options was the Fund. The Plan did not except or

25   exclude the Fund from the Plan's purposes alleged above or provide that a purpose of the Plan

26   was to offer the Fund.

27

28

## DEFENDANTS WERE FIDUCIARIES

23.    At all times relevant to this Complaint, Defendants were fiduciaries of the Plan as defined by ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised authority or control respecting management or disposition of Plan assets.

24.    Defendant Nokia U.S. was a fiduciary of the Plan.  According to the Trust Agreement between Nokia U.S. and Fidelity, Nokia U.S. was the Plan Administrator and the "Named Fiduciary" of the Plan.  Trust Agreement between Nokia U.S. and Fidelity dated as of April 1, 2005 ("Trust Agreement"), Sec. 1(a) and (x).  Nokia U.S. had the duty to direct the Trustee as to the investment options available under the Plan, including the Fund.  *Id.* at Sec. 5(b).  Nokia U.S. also had the duty, "after consultation with the Trustee, [to] establish and communicate to the Trustee in writing a target percentage and drift allowance for such short-term liquid investments" that would be held by the Fund.  *Id.* at Sec. 5(e).  Moreover, under the section heading "Fiduciary Duty," Nokia U.S. had the duty "to continually monitor the suitability of acquiring and holding Sponsor Stock under the fiduciary duty rules of § 404(a) of ERISA (as modified by section 402(a)(2) of ERISA)." *Id.* at Sec. 5(e)(ii) (N000127).  Nokia U.S. was also a fiduciary because it had the duty, through its Board of Directors and "any Officer of the Company" to appoint and monitor members of the Committee.  Plan Art. 8.01.  Finally, Nokia U.S. was a fiduciary because it had the duty, through its Board of Directors to appoint and monitor the Trustee.  Plan Art. 8.01.

25.    The Committee was a fiduciary of the Plan.  The Committee, along with Nokia U.S., had the duty to administer the Plan.  Plan Art. 1.11, 8.01; SPD at 1.  According to the Nokia Retirement Savings and Investment Plan Summary Plan Description (as revised 2004) ("SPD"), the Committee is the Plan Administrator.  SPD at 1.

26.    According to the Plan's Investment Policy:

The Committee is responsible for determining:

- Number and type of investment choices; and

- Selection or removal of investment funds and investment consultants.

The Committee's responsibilities include the review, on a timely basis, but not

less than annually, of each fund's investment results, as well as an assessment of each investment fund's organization, people and processes.

Investment Policy at 2.

27.    Furthermore, pursuant to the Committee's charter:

The 401k Committee ("Committee") is responsible for submitting to the Nokia Inc. Board of Directors ("Board"), recommendations on the design and administration of the Nokia Retirement Savings and Investment Plan ("Plan") that supports the mission, values and goals of Nokia employees.  The Committee is responsible for the Investment Guidelines ("Guidelines") of the Plan and for ensuring that fund offerings are aligned with the Investment Guidelines.

Committee Charter: Nokia 401k Committee, revised as of October 2007 ("Committee Charter") at 1.

28.    The Committee Charter also provides that further specific responsibilities of the 401k Committee include (but are not limited to):

- Review of Plan documentation for legal and regulatory compliance.

- Recommend changes to the Plan.

- Review of fund performance and recommendations on fund replacement/addition/removal as needed.

Committee Charter at 1.

29.    According to the Committee Charter:

The 401k Committee voting members shall be:

- Representative of a Business Unit/Shared Service of Subject Matter Expert

- Sufficiently knowledgeable about 401k plans in general, and Nokia Plan's design in particular, to render sound decisions.

- Have sufficient ability to adequately represent their business group and/or functional area.

In addition to being representative of the Business Units the following groups are required to have ongoing representation on the Committee:  Corporate Finance, Corporate Legal, Senior Human Resources, and a 401(k) subject matter expert (SME).

Composition of Committee is to be reviewed annually to ensure that it reflects the current population.

1    Committee Charter at 1.

2        30.    The Board Members were fiduciaries because they had the duty to appoint and

3    monitor the Committee and the Trustee. Plan Art. 8.01. The Board Members were also charged

4    with reviewing any recommendations made by the Committee to the Board concerning, *inter*

5    *alia*, the Plan assets. Committee Charter at 1.

6        31.    According to the SPD, the people responsible for operating the Plan, which

7    includes all of the Defendants, are fiduciaries. SPD at 17.

8                              **DEFENDANTS' FIDUCIARY DUTIES**

9        32.    *The Statutory Requirements.* ERISA imposes strict fiduciary duties upon plan

10   fiduciaries. ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

11       [A] fiduciary shall discharge his duties with respect to a plan solely in the interest
         of the participants and beneficiaries and . . . for the exclusive purpose of
12       providing benefit to participants and their beneficiaries; and defraying reasonable
         expenses of administering the plan; with the care, skill, prudence, and diligence
13       under the circumstances then prevailing that a prudent man acting in a like
14       capacity and familiar with such matters would use in the conduct of an enterprise
         of like character and with like aims; by diversifying the investments of the plan so
15       as to minimize the risk of large losses, unless under the circumstances it is clearly
         prudent not to do so; and in accordance with the documents and instruments
16       governing the plan insofar as such documents and instruments are consistent with
17       the provisions of this title and Title IV.

18       33.    *The Duty of Loyalty.* ERISA imposes on a plan fiduciary the duty of loyalty –

19   that is, the duty to "discharge his duties with respect to a plan solely in the interest of the

20   participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to

21   participants and their beneficiaries . . . ."

22       34.    The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them

23   promptly when they occur. A fiduciary must always administer a plan with an "eye single" to

24   the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries

25   themselves or the plan sponsor.

26       35.    *The Duty of Prudence.* ERISA § 404(a)(1)(B) also imposes on a plan fiduciary

27   the duty of prudence – that is, the duty "to discharge his duties with respect to a plan solely in the

28   interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence

1    under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar

2    with such matters would use in the conduct of an enterprise of a like character and with like

3    aims. . . ."

4         36.    *The Duty to Investigate and Monitor Investment Alternatives.*   With respect to a

5    pension plan such as the Plan, the duties of loyalty and prudence also entail a duty to conduct an

6    independent investigation into, and continually to monitor, the merits of the investment

7    alternatives in the Plan including employer securities, to ensure that each investment is a suitable

8    option for the Plan.

9         37.    *The Duty to Monitor Appointed Fiduciaries.*   Fiduciaries who have the

10   responsibility for appointing other fiduciaries have the further duty to monitor the fiduciaries

11   thus appointed.  The duty to monitor entails both giving information to and reviewing the actions

12   of the appointed fiduciaries.  In a 401(k) plan such as the Plan the monitoring fiduciaries must

13   therefore ensure that the appointed fiduciaries:

14        a.    possess the needed credentials and experience, or use qualified
          advisors and service providers to fulfill their duties;
15

16        b.    are knowledgeable about the operations of the Plan the goals of the
          Plan and the behavior of Plan's participants;
17

18        c.    are provided with adequate financial resources to do their jobs;
19
          d.    have adequate information to do their jobs of overseeing the Plan
20        investments with respect to company stock;

21        e.    have access to outside, impartial advisors when needed;
22
          f.    maintain adequate records of the information on which they base
23        their decisions and analysis with respect to the Plan's investment options; and

24        g.    report regularly to the monitoring fiduciaries.
     The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-

25   on fiduciaries.

26        38.    *The Duty Sometimes to Disregard Plan Documents.*   A fiduciary may not avoid

27   his fiduciary responsibilities by relying solely on the language of the plan documents.  While the

28

basic structure of a plan may be specified, within limits, by the plan sponsor, the fiduciary may not blindly follow the plan document if to do so leads to an imprudent result.   ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

39.   *Co-Fiduciary Liability.*   A fiduciary is liable not only for fiduciary breaches within the sphere of his own responsibility, but also as a co-fiduciary in certain circumstances. ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances
>
> (1)   if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)   if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)   if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

40.   *Non-Fiduciary Liability.*   Under ERISA, non-fiduciaries who knowingly participate in a fiduciary breach may themselves be liable for certain relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

## BACKGROUND

41.   Prior to the beginning of the Class Period, Nokia was a dominant force in the mobile phone market; however, over the last five years, Nokia suffered dramatically as customers migrated to the exploding market for "smartphones." Competition from, for example, the Apple iPhone and the Android phones rapidly deteriorated Nokia's market share. Nokia has lost over 80 percent, or $80 billion, of its market value since the iPhone was introduced in 2007; the stock that once traded at over $54.00 per share was trading between $4 and $5 per share in January 2012.

42.   Nokia determined that its Symbian and MeeGo cellphone operating systems could

1   not compete with the iPhone Android phones.   In response to these pressures from other

2   "smartphones" such as the iPhone and Android, Nokia began a costly restructuring plan which

3   involved shifting from its legacy Symbian operating system to a system using a Microsoft

4   Windows platform.  As part of this restructuring effort, Nokia linked up with Microsoft to create

5   the Lumia 900 Windows smartphone which Nokia would offer exclusively through AT&T.

6       43.    During its restructuring, the Company was burning through cash at an astonishing

7   rate.

8       44.    The Company was rapidly eliminating thousands of jobs and entire projects.

9       45.    Analysts soon began predicting that Nokia could run out of cash in early 2012.

10   Nokia's credit ratings for debt instruments, which would have priority in bankruptcy over

11   stockholders such as the Plan, were declining sharply.

12           **NOKIA WAS AN IMPRUDENT RETIREMENT INVESTMENT**

13   **A.**    **Nokia Is A "Burning Platform"**

14       46.    On February 9, 2011, *Wall Street Journal.com* published the full text of an

15   internal memorandum by Nokia President and CEO Stephen Elop, which described Nokia as a -

16   "Burning Platform:"

17         *"We too, are standing on a "burning platform,"* and we must decide how we are
      going to change our behavior.

18

19         Over the past few months, I've shared with you what I've heard from our
      shareholders, operators, developers, suppliers and from you.  Today, I'm going to

20         share what I've learned and what I have come to believe.

21         *I have learned that we are standing on a burning platform.*
      *And, we have more than one explosion—we have multiple points of scorching*

22         *heat that are fuelling a blazing fire around us.*

23         For example, there is intense heat coming from our competitors, more rapidly

24         than we ever expected.  Apple disrupted the market by redefining the smartphone
      and attracting developers to a closed, but very powerful ecosystem.

25

26         In 2008, Apple's market share in the $300+ price range was 25 percent; by 2010 it
      escalated to 61 percent.  They are enjoying a tremendous growth trajectory with a

27         78 percent earnings growth year over year in Q4 2010.  Apple demonstrated that
      if designed well, consumers would buy a high-priced phone with a great

28         experience and developers would build applications.  They changed the game, and

today, Apple owns the high-end range.

And then, there is Android.  In about two years, Android created a platform that attracts application developers, service providers and hardware manufacturers. Android came in at the high-end, they are now winning the mid-range, and quickly they are going downstream to phones under €100.  Google has become a gravitational force, drawing much of the industry's innovation to its core.

Let's not forget about the low-end price range.  In 2008, MediaTek supplied complete reference designs for phone chipsets, which enabled manufacturers in the Shenzhen region of China to produce phones at an unbelievable pace.  By some accounts, this ecosystem now produces more than one third of the phones sold globally—taking share from us in emerging markets.

*While competitors poured flames on our market share, what happened to Nokia? We fell behind, we missed big trends, and we lost time.*  At that time, we thought we were making the right decisions; but with the benefit of hindsight, we now find ourselves years behind.

The first iPhone shipped in 2007, and we still don't have a product that is close to their experience.  Android came on the scene just over 2 years ago, and this week they took our leadership position in smartphone volumes.  Unbelievable.

We have some brilliant sources of innovation inside Nokia, but we are not bringing it to market fast enough.  We thought MeeGo would be a platform for winning high-end smartphones.  However, at this rate, by the end of 2011, we might have only one MeeGo product in the market.

At the midrange, we have Symbian.  It has proven to be non-competitive in leading markets like North America.  Additionally, Symbian is proving to be an increasingly difficult environment in which to develop to meet the continuously expanding consumer requirements, leading to slowness in product development and also creating a disadvantage when we seek to take advantage of new hardware platforms.  As a result, if we continue like before, we will get further and further behind, while our competitors advance further and further ahead.

At the lower-end price range, Chinese OEMs are cranking out a device much faster than, as one Nokia employee said only partially in jest, "the time that it takes us to polish a PowerPoint presentation."  They are fast, they are cheap, and they are challenging us.

And the truly perplexing aspect is that we're not even fighting with the right weapons.  We are still too often trying to approach each price range on a device-to-device basis.

The battle of devices has now become a war of ecosystems, where ecosystems include not only the hardware and software of the device, but developers, applications, ecommerce, advertising, search, social application, location-based

services, unified communications and many other things. Our competitors aren't taking our market share with devices; they are taking our market share with an entire ecosystem. This means we're going to have to decide how we either build, catalyse or join an ecosystem.

This is one of the decisions we need to make. In the meantime, we've lost market share, we've lost mind share and we've lost time.

On Tuesday, Standard & Poor's informed that they will put our A long term and A-1 short term ratings on negative credit watch. This is a similar rating action to the one that Moody's took last week. Basically it means that during the next few weeks they will make an analysis of Nokia, and decide on a possible rating downgrade. Why are these credit agencies contemplating these changes? Because they are concerned about our competitiveness.

Consumer preference for Nokia declined worldwide. In the UK, our brand preference has slipped to 20 percent, which is 8 percent lower than last year. That means only 1 out of 5 people in the UK prefer Nokia to other brands. It's also down in the other markets, which are traditionally our strongholds: Russia, Germany, Indonesia, UAE, and on and on and on.

How did we get to this point? Why did we fall behind when the world around us evolved?

This is what I have been trying to understand. I believe at least some of it has been due to our attitude inside Nokia. We poured gasoline on our own burning platform. I believe we have lacked accountability and leadership to align and direct the company through these disruptive times. We had a series of misses. We haven't been delivering innovation fast enough. We're not collaborating internally.

*Nokia, our platform is burning.*

(Emphasis added.)

**B.    "Too Late" for Nokia To Adapt**

47.    The dire situation detailed by CEO Elop in his February 9, 2011 memorandum only grew worse, and continues to this day. By the beginning of the Class Period, on January 19, 2012, Nokia's condition had deteriorated so far that industry analyst Om Malik opined that Nokia was a "likely candidate" to follow Kodak into bankruptcy because it had failed to adapt to smartphone technology. According to Malik, "it is too late for the Finnish company." As of this date, and continuing throughout the Class Period, Nokia stock was simply too risky for retirement nest eggs.

48.   On January 26, 2012, Nokia reported a 73% fall in its fourth-quarter 2011 earnings, with net losses of $1.38 billion, as sales slumped 21%.

49.   Also on January 26, 2012, and in response to Nokia's earnings announcement, industry analyst Michael Schroeder opined that the announcement "highlights that the start of the Windows strategy is slow, and we have very little concrete data to predict its success at this point." Schroeder continued: "here are a lot of uncertainties. These are critical times for the future of the whole company. The next few months will be extremely important."

50.   The next day, on January 27, 2012, Deutsche Bank analyst Frederick Searby said that Nokia was "running to stand still" and may not be able to offset the decline of Symbian revenue with Windows devices and cost cutting fast enough. A Swedbank analyst said that Nokia was even more dependent on the success of Windows following the "quicker death of Symbian than previously expected."

51.   On February 1, 2012, Nokia Siemens, a joint venture between Nokia and Siemens which was expected to increase the global sales of both companies, announced that it would cut 1,200 jobs in Finland and lay off another 2,900 employees in Germany as part of its restructuring efforts. Earlier, in November 2011, the Nokia Siemens joint venture had announced that it would cut 17,000 jobs, or 23% or its workforce by 2013.

52.   On April 11, 2012, Nokia announced that it had slashed its forecast because of "declining profitability in its smartphone business and weak sales in India, the Middle East, Africa and China." In response, Nokia was "reviewing a number of options including selling non-core assets."

53.   In response to Nokia's reduced forecast, German industry analyst Thomas Langer of WestLB said: "[i]t's a disaster… It looks like a lost year 2012 and there is increasing uncertainty about 2013 and the company's future."

54.   On April 16, 2012, Moody's cut Nokia's debt rating to the lowest investment-grade level and the senior debt rating was reduced by one step to Baa3 from Baa2, with a negative outlook. Moody's analyst Wolfgang Draack wrote: "Moody's believes that the structural change facing Nokia's mobile Phones segment may not be easy to address, such as the

1    market share gains recorded by makers of very low-end phones or new promotions by Chinese

2    carriers."

3        55.    On the same day, analyst Louis Landeman of Deutsche Bank A/S wrote that, even

4    though Moody's had not cut Nokia's debt ratings to below investment grade, Moody's "would

5    have been justified to do that."

6        56.    On April 19, 2012, Nokia announced a net loss of $1.2 billion in the first quarter

7    of 2012, citing burdens of restructuring costs and its unprofitable venture with Siemens.

8        57.    An April 19, 2012 article entitled "Nokia: on the Verge of Bankruptcy?" in *Henry*

9    *Blodget Business Insider* stated:

10       Nokia appears to be in trouble.... The company is burning cash at a mind
         boggling rate, and it's about to run into a cash crunch.... The cash situation has
11       gotten dire enough that Nokia CEO Stephen Elop is already talking about the
         need to conserve it.  When a company that knows it needs to be super-aggressive
12       to have any chance of saving itself starts talking about the need to conserve cash,
         you know there's a problem.
13

14       58.    Analysts began to comment that Nokia was doing worse than they had previously

15   thought.  On April 20, 2012, Pierre Ferragu of Bernstein Research said that the average Lumia

16   selling price was much lower than expected and that Nokia's sales of Symbian units continued

17   falling and would likely hit _zero_ by 2015.

18       59.    On April 24, 2012, Fitch cut Nokia's debt rating to "junk."  Fitch cited

19   deterioration in the handset market and said it may further cut the rating if Nokia's revenue does

20   not stabilize.

21       60.    *Bloomberg News* reported on the same day that the "cost of insuring against

22   default on Nokia's debt surged to a record," as credit default swaps on Nokia bonds rose to 701

23   basis points.

24       61.    On April 25, 2012, a *Bloomberg* article, entitled "Nokia CDS at Record Show

25   Junk Isn't Low Enough," stated that credit default swaps on Nokia soared to a record, indicating

26   that Nokia's "bonds are riskier than implied by the junk grade Fitch gave them.  "According to

27   the article, the "market sees a 42% chance that Nokia will default within five years."

28       62.    On April 27, 2012, a *24/7 Wall St.* article, entitled "Nokia, Left for Dead, Cut To

                                                14

1   Junk By S&P," announced that Standard & Poor's downgraded Nokia's debt to "junk." The

2   same article reported that it is "only a matter of time before Nokia is broken up into two piece

3   [sic], one smartphone, and the other cheap handsets, and sold."

4       63.     On May 1, 2012, Zacks stated "we remain very much skeptical regarding the

5   company's turnaround any time soon."

6       64.     On May 3, 2012, outgoing Nokia board chairman Jorma Ollila stated that Nokia

7   had failed to develop necessary ecosystems and technology to deal with the fact that the "internet

8   would be in everyone's pockets" and "needed a new beginning." In other words, during the

9   Class Period, Nokia was little more than a high risk start-up company.

10      65.     On May 14, 2012, analyst Andy Perkins of Societe Generale said that "there

11  could be a substantial fall in sales with further restructuring" that "could be enough to burn

12  through most of Nokia's existing cash pile and even bring into question Nokia's very survival."

13      66.     Also on May 14, 2012, in an article entitled *"Almost Nothing Can Save Nokia,*

14  *Except Maybe Widespread Poverty,"* John C. Ogg in *24/7 Wall St.* said "Nokia Corporation has

15  been on a multiple-leg flight. Destination: Hell." In a Societe-Generale report of the same

16  date, Ogg called it a "dire warning," and said "[t]hat it is not exactly a call that Nokia is going

17  bankrupt, but it sure feels like a dance around that notion without causing undue offense and

18  pressure merely by mentioning such a possibility."

19      67.     On May 17, 2012, Jacob Steinberg said in *Seeking Alpha*: "[i]f we look at the

20  company's share price, it is safe to assume that the market thinks that Nokia will go bankrupt

21  within a couple of years."

22      68.     On May 18, 2012, an article in the *Telegraph*, entitled "Nokia Could Exhaust

23  Cash Reserves Next Year," reported that Nokia was "draining its €4.9 bn (£3.9 bn) cash buffer at

24  an unsustainable rate and could be at risk of default if it does not halt the pace."

25      69.     According to a June 14, 2012 *Wall Street Journal* article, Nokia "sparked new

26  doubts about its viability Thursday by warning its losses will be worse than the company

27  expected just two months ago and by failing to predict when they might come to an end." Nokia

28  also announced that it would eliminate another 10,000 jobs (in addition to the 14,000 job

1  reduction announced during the previous year).

2      70.    On the same day, analyst Alexander Peterc of *The Economic Times* said the
3  "Company risks going *out of business in* as little as two years unless it can reduce expenses."
4  (Emphasis added.)  Peterc also said "they can't continue like this."

5      71.    On June 15, 2012, the *Wall Street Journal's MarketWatch* announced that
6  Moody's had downgraded Nokia debt to junk status, which "means Nokia's credit now carries
7  junk status by all three major credit rating agencies."  The article also reported that in a separate
8  statement, Fitch Ratings stated that "Nokia now is facing a 'precarious combination of a depleted
9  cash balance, without an end in sight to declining cash flows.'"

10     72.    On July 19, 2012, the *Wall Street Journal's MarketWatch* stated that "Nokia is
11 fighting for survival after it made a slow start into the lucrative smartphone market and lost
12 market share to sure-footed rivals such as iPhone-maker Apple, Inc. and Samsung."

13     73.    On September 5, 2012, the *Wall Street Journal's MarketWatch* discussed the
14 release of Nokia's new Lumina 920 smartphone, the new "flagship" for a Windows based phone.
15 Analyst Ed Snyder "said the new device will likely be considered a disappointment."  According
16 to Snyder, "[p]eople were expecting some kind of silver bullet.  It was more likely a silver bullet
17 to the head."

18     74.    In the same article, analyst Mark Sue of RBC Capital [wrote] that the "'muted'
19 early reaction to the new Lumina phones, 'coupled with competition from market leaders Apple
20 and Samsung may make recovery for Nokia a major undertaking.'"

21     75.    Also on September 5, 2012, David Penn wrote in the *Wall Street Journal's*
22 *MarketWatch* that "Nokia's days seem increasingly numbered."

23     76.    On September 6, 2012, the *Wall Street Journal* reported that Deutsche Bank and
24 Societe Generale concluded that the new Nokia smartphones "didn't turn out to be the game
25 changer that the struggling company needed ...."

26     77.    On September 25, 2012, in a *Forbes* article entitled, "Nokia: Analyst Sees No
27 Value Outside Cash And Patents," Eric Savitz cited BMO Capital analyst Tim Long, who
28 concluded that Nokia would not achieve its "bet the ranch" strategy to "become a meaningful

player in the smartphone sector," Nokia's "core business is worth nothing at all," and all of

Nokia's value lies, not in its operating results from its "intellectual property and cash":

> BMO Capital analyst Tim Long late yesterday cut his rating on Nokia to Underperform from Market Perform, declaring in a research note that *he is "skeptical" that the Microsoft Windows Mobile software on which the company has bet the ranch will become a meaningful player in the smartphone sector.*
>
> He maintains his $2 target on the stock, and basically asserts that *the core business is worth nothing at all.*
>
> ....
>
> *Long puts the value of Nokia at $2 a share – all of that from intellectual property and cash.* "We believe any positive value from other segments would be negated by losses at the handset business," he writes.

(Emphasis added).

78.     Even after the release of Microsoft's Windows 8 in late October 2012, Nokia's prospects continue to dim.  In the November 5, 2012 edition of *Forbes*, an article entitled "Nokia on the Brink" notes the continued failure of Nokia to make inroads against its competition.  As the article notes, Nokia's decision to link with Windows Mobile has not stemmed the tide: "But here's the thing: Windows Phone has been running sixth in a three-way race."

79.     The *Forbes* article also disparages Nokia's claim that there is still time to barge into a "wide-open field":

> In 2007 Nokia had a 37.8% share of the global handset market, ahead of Motorola with 14.3% and Samsung 13.4%, according to Gartner.  Then came the iPhone and Android, showing up Nokia's software as well behind the curve.  Today Nokia's share is down to 19.9%, behind Samsung at 21.6%.  The situation is even worse than the numbers suggest:  Most of the phones Nokia sells are low-margin, sub-$100 models targeted at emerging markets.  Kulbinder Garcha at Credit Suisse predicts Nokia's volume share will drop to 2.4% in 2013.

80.     Throughout the Class Period, Defendants took no action to protect the Plan's assets.  Instead, Defendants imprudently allowed the Plan to continue offering the Fund as an investment option, and they continued to invest the Plan's assets in Company Stock when it was no longer prudent to do so as a result of the Company's dire circumstances as alleged above.

**CAUSES OF ACTION**

**Count I:  Failure to Prudently and Loyally Manage the Plan and Assets of the Plan**

81.    Plaintiff incorporates by reference the paragraphs above.

82.    This Count alleges fiduciary breach against Nokia U.S. and the Committee Defendants (the "Prudence Defendants").

83.    As alleged above, during the Class Period, the Prudence Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

84.    As alleged above, the scope of the fiduciary duties and responsibilities of the Prudence Defendants included managing the assets of the Plan for the sole and exclusive benefit of Participants and beneficiaries and with the care, skill, diligence, and prudence required by ERISA.  The Prudence Defendants were directly responsible for, among other things, selecting and offering only prudent investment options, eliminating imprudent options, determining the options offered under the Plan for the investment of employer contributions to the Plan and directing the Trustee regarding the same, determining the options for investing Fund assets, evaluating the merits of the Plan's investments on an ongoing basis, and taking all necessary steps to ensure that the Plan assets were invested prudently.

85.    According to United States Department of Labor ("DOL") regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved; and (b) he has acted accordingly.

86.    The Prudence Defendants were obliged to prudently and loyally manage all of the Plan assets.  However, their duties of prudence and loyalty were especially significant with respect to Company Stock because: (a) Company Stock is a particularly risky and volatile investment; and (b) Participants tend to underestimate the likely risk and overestimate the likely

1  return of investment in company stock.

2  87.  The Prudence Defendants had a duty to follow a regular, appropriate systematic

3  procedure to evaluate the prudence of investing Plan assets in the Fund and Fund assets in

4  Company Stock, but had no such procedure.  Moreover, they failed to conduct an appropriate

5  investigation of the merits of continued investment in the Fund or Company Stock.  Given the

6  widespread public disclosure of Nokia's dire circumstances as alleged above, such an

7  investigation would have revealed to a reasonably prudent fiduciary the imprudence of

8  continuing to offer the Fund as an investment option or make and maintain investment in the

9  Fund and/or Company Stock under these circumstances.

10  88.  Contrary to their duties and obligations under the Plan Documents and ERISA,

11  the Prudence Defendants failed to loyally and prudently manage the assets of the Plan.

12  Specifically, during the Class Period, these Defendants knew or should have known that

13  Company Stock was no longer a suitable and appropriate investment for the Plan, but was,

14  instead, an imprudent investment in light of, *inter alia*, widely available public information.

15  89.  Nonetheless, during the Class Period, these Defendants continued to permit the

16  Plan to offer the Fund as an investment option and continued to permit the Plan to invest in

17  Company Stock.  They did so despite the fact that they knew or should have known that Nokia

18  was in dire circumstances.

19  90.  The Prudence Defendants breached their fiduciary duty respecting the Plan's

20  investment in Company Stock described above, under the circumstances alleged herein, in that a

21  prudent fiduciary acting under similar circumstances would have made different investment

22  decisions and, in particular, would not have permitted the Plan to offer the Fund as an investment

23  option or to invest in the Fund, or permit the Fund to invest in Company Stock.

24  91.  Given the information described above, the Prudence Defendants could not

25  possibly have acted prudently when they continued to offer the Fund or invest the Plan's assets

26  in Company Stock because, among other reasons:

27  a.  The Prudence Defendants knew of and/or failed to investigate the

28  Company's dire circumstances as alleged above; and

COMPLAINT UNDER THE EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA) FOR BREACH OF FIDUCIARY DUTY

b.    The risk associated with the investment in Company Stock during the Class Period was by far above and beyond the normal, acceptable risk associated with retirement plan investment in company stock.

92.    Knowing of this extraordinary risk, the Prudence Defendants had a duty to avoid permitting the Plan or any Participant from investing the Plan's assets in Company Stock.

93.    The Prudence Defendants breached their fiduciary duties during the Class Period by, *inter alia*, (i) failing to investigate the continued prudence of offering Company Stock as a Plan investment; (ii) failing to establish a process of reviewing and evaluating the continued prudence of Plan investment in Company Stock; (iii) failing to engage independent advisors, including investment advisers and/or outside counsel, who could make independent judgments concerning the continued prudence of offering the Fund as an investment option for the Plan, and/or the Plan's investment in Company Stock; (iv) failing to suspend or limit new Plan investments in the Fund and Fund investments in Company Stock; (v) failing to divest the Fund's holdings of Company Stock; (vi) failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances that made Company Stock an unsuitable investment for the Plan; (vii) failing to take such other steps as were necessary to ensure that Participants' interests were loyally and prudently served, including making any recommendations to the Director Defendants concerning any protective measures to be undertaken with regard to the Plan's holdings invested in Company Stock; and (viii) with respect to each of these above failures, doing so in order to avoid adversely impacting their own compensation or drawing attention to the Company's dire circumstances, and by otherwise placing their own and the Company's improper interests above the interests of the Participants with respect to the Plan's investment in Company Stock.

94.    As a consequence of the Prudence Defendants' breaches of fiduciary duty alleged in this Count, the Plan suffered tremendous losses. If the Prudence Defendants had discharged their fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the other Class members, lost

1   millions of dollars of retirement savings.

2   95.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2)

3   and (a)(3), the Prudence Defendants are liable to restore the losses to the Plan caused by their

4   breaches of fiduciary duties alleged in this Count and to provide other equitable relief as

5   appropriate.

6   **Count II: Failure to Monitor Fiduciaries**

7   96.     Plaintiff incorporates by reference the allegations above.

8   97.     This Count alleges fiduciary breach against Nokia U.S. and the Director

9   Defendants (the "Monitoring Defendants").

10   98.     As alleged above, during the Class Period the Monitoring Defendants were named

11   fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within

12   the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by

13   the duties of loyalty, exclusive purpose, and prudence.

14   99.     As alleged above, the scope of the fiduciary responsibilities of the Director

15   Defendants included the responsibility to appoint, remove, and, thus, monitor the performance of

16   the Committee Defendants.

17   100.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries

18   are performing their fiduciary obligations, including those with respect to the investment and

19   holding of plan assets, and must take prompt and effective action to protect the plan and

20   participants when they are not.

21   101.    The monitoring duty further requires that appointing fiduciaries have procedures

22   in place so that on an ongoing basis they may review and evaluate whether the "hands on"

23   fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work

24   and the plan's performance, and by ensuring that they have a prudent process for obtaining the

25   information and resources they need). In the absence of a sensible process for monitoring their

26   appointees, the appointing fiduciaries would have no basis for prudently concluding that their

27   appointees were faithfully and effectively performing their obligations to plan participants or for

28   deciding whether to retain or remove them.

102. Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the Plan and the Plan assets, or that may have an extreme impact on the Plan and the fiduciaries' investment decisions regarding the Plan.

103. The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

a. failing, at least with respect to the Plan's investment in Company Stock, to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to Company Stock;

b. failing to ensure that the monitored fiduciaries appreciated the true extent of the risks of investing in the Company Stock, and the likely impact of such practices on the value of the Plan's investments in Company Stock;

c. to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plan's assets and, in particular, the Plan's investment in the Company Stock; and

d. failing to remove appointees whose performance was inadequate in that they continued to permit the Plan to make and maintain investments in the Company Stock despite the practices that rendered Company Stock an imprudent investment during the Class Period.

104. As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses. If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan and indirectly Plaintiff and the other Class members, lost millions of dollars of retirement savings.

1    105.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2)

2    and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their

3    breaches of fiduciary duties alleged in this Count and to provide other equitable relief as

4    appropriate.

5                          **Count III: Co-Fiduciary Liability**

6        106.    Plaintiff incorporates by reference the allegations above.

7        107.    This Count alleges co-fiduciary liability against all Defendants (the "Co-fiduciary

8    Defendants").

9        108.    As alleged above, during the Class Period the Co-Fiduciary Defendants were

10   named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries

11   within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were

12   bound by the duties of loyalty, exclusive purpose, and prudence.

13       109.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a

14   fiduciary, in addition to any liability which he may have under any other provision, for a breach

15   of fiduciary responsibility of another fiduciary with respect to the same plan if he knows of a

16   breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  The Co-

17   fiduciary Defendants breached all three provisions.

18       110.    *Knowledge of a Breach and Failure to Remedy.*  ERISA § 405(a)(3), 29 U.S.C.

19   § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another

20   fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable

21   efforts under the circumstances to remedy the breach.  Upon information and belief, each

22   Defendant knew of the breaches by the other fiduciaries and made no efforts, much less

23   reasonable ones, to remedy those breaches.

24       111.    In particular, because the Director Defendants knew of the Company's failures

25   and inappropriate business practices, they also knew that the Prudence Defendants were

26   breaching their duties by continuing to invest in Company Stock.  Yet, they failed to undertake

27   any effort to remedy these breaches and, instead, compounded them by downplaying the

28   significance of the Company's failed and inappropriate business practices and obfuscating the

1  risk that the practices posed to the Company and, thus, to the Plan.

2      112.  *Knowing Participation in a Breach.*  ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1),

3  imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with

4  respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an

5  act or omission of such other fiduciary, knowing such act or omission is a breach. The

6  Monitoring Defendants knowingly participated in the breaches of the Prudence Defendants

7  because, as alleged above, they had actual knowledge of the facts that rendered Company Stock

8  an imprudent retirement investment and, yet, ignoring their oversight responsibilities, permitted

9  the Prudence Defendants to breach their duties.  Moreover, as alleged above, each of the

10  Defendants participated in the management of the Plan's improper investment in the Fund and,

11  upon information and belief, knowingly participated in the improper management of that

12  investment by the other Defendants.

13      113.  *Enabling a Breach.*  ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability

14  on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), in the

15  administration of his specific responsibilities which give rise to his status as a fiduciary, he has

16  enabled another fiduciary to commit a breach.

17      114.  The Monitoring Defendants' failure to monitor the Prudence Defendants enabled

18  those Defendants to breach their duties.

19      115.  As a direct and proximate result of the breaches of fiduciary duties alleged herein,

20  the Plan, and indirectly Plaintiff and the other Participants and beneficiaries, lost millions of

21  dollars of retirement savings.

22      116.  Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2)

23  and (a)(3), the Co-fiduciary Defendants are liable to restore the losses to the Plan caused by their

24  breaches of fiduciary duties alleged in this Count and to provide other equitable relief as

25  appropriate.

26                        **CAUSATION**

27      117.  The Plan suffered millions of dollars in losses of vested benefits because

28  substantial assets of the Plan were imprudently invested or allowed to be invested by Defendants

1    in the Fund during the Class Period in breach of Defendants' fiduciary duties.

2         118.   During the Class Period, Company Stock had become so risky that it was

3    imprudent under the circumstances to subject the Plan's assets to this investment, as the Plan's

4    stated objective to "help participants in accumulating savings to achieve financial security upon

5    retirement" (N000201), could no longer be met through the Plan's investments in Company

6    Stock. Had the Defendants properly discharged their fiduciary and co-fiduciary duties, including

7    investigating the continued prudence of offering Company Stock as a Plan investment option,

8    consulting independent investment advisors concerning the continued prudence of offering

9    Company Stock as a Plan investment option, monitoring and removing fiduciaries who failed to

10   satisfy their ERISA mandated duties of prudence and loyalty, eliminating Company Stock as an

11   investment alternative when it became imprudent, closing the Plan to new investments in

12   Company Stock, and limiting or divesting the Plan's holdings of Company Stock when

13   maintaining such an investment became imprudent, the Plan and its participants and beneficiaries

14   would have avoided some or all of the losses that they suffered.

15                  **REMEDY FOR BREACHES OF FIDUCIARY DUTY**

16        119.   The Defendants breached their fiduciary duties in that they knew or should have

17   known the facts as alleged above and, therefore, knew or should have known that the Plan's

18   assets should not have been invested in Company Stock during the Class Period.

19        120.   As a consequence of the Defendants' breaches, the Plan suffered a significant loss

20   of vested benefits.

21        121.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a plan participant to bring

22   a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  ERISA § 409 requires

23   "any person who is a fiduciary who breaches any of the duties imposed upon fiduciaries to make

24   good to such plan any losses to the plan."  ERISA § 409 also authorizes "such other equitable or

25   remedial relief as the court may deem appropriate."

26        122.   Plaintiff and the Class are therefore entitled to relief from Defendants in the form

27   of:

28                  a.      a monetary payment to the Plan to make good to the Plan the loss of

COMPLAINT UNDER THE EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA) FOR BREACH OF FIDUCIARY DUTY

1   benefits to the Plan resulting from the breaches of fiduciary duties alleged above in an

2   amount to be proven at trial based on the principles described above, as provided by

3   ERISA § 409(a), 29 U.S.C. § 1109(a);

4          b.    injunctive and other appropriate equitable relief to remedy the breaches

5   alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a),

6   1132(a)(2) and (3);

7          c.    reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29

8   U.S.C. § 1132(g), the common fund doctrine, and other applicable law;

9          d.    taxable costs and interest on these amounts, as provided by law; and

10         e.    such other legal or equitable relief as may be just and proper.

11  **CLASS ACTION ALLEGATIONS**

12      123.    To the extent appropriate, Plaintiff brings this action as a class action pursuant to

13  Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of

14  Plaintiffs and the following class of persons similarly situated (the "Class"):

15      All persons, other than Defendants, who were participants in or beneficiaries of
    the Plan at any time between January 19, 2012 through and including the present,
16  and whose accounts included investments in Company Stock or units in a Nokia
    Stock Fund.
17

18      124.    *Class Period.*  The fiduciaries of the Plan knew or should have known at least by

19  January 19, 2012, that the Company's material weaknesses were so pervasive that Company

20  Stock could no longer be offered as a prudent investment for retirement Plan.

21      125.    *Numerosity.*  The members of the Class are so numerous that joinder of all

22  members is impracticable.  While the exact number of Class members is unknown to Plaintiff at

23  this time, and can only be ascertained through appropriate discovery, on information and belief,

24  plaintiff believes there are thousands of Class members, based on Nokia's Form 10-K for the

25  period ending December 31, 2010 which provides that the Plan had in excess of $500 million in

26  assets.

27      126.    *Commonality.*  Common questions of law and fact exist as to all members of the

28  Class and predominate over any questions affecting solely individual members of the Class.

Among the questions of law and fact common to the Class are:

      a.    whether Defendants each owed a fiduciary duty to Plaintiff and members of the Class;

      b.    whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

      c.    whether Defendants violated ERISA; and

      d.    whether the Plan suffered losses and, if so, what is the proper measure of damages.

127.   *Typicality.*  Plaintiff's claims are typical of the claims of the members of the Class because: (a) to the extent Plaintiff seeks relief on behalf of the Plan pursuant to ERISA § 502(a)(2), their claims on behalf of the Plan are not only typical of, but identical to claims under this section brought by any Class member; and (b) to the extent Plaintiff seeks relief under ERISA § 502(a)(3) on behalf of himself for equitable relief, that relief would affect all Class members equally.

128.   *Adequacy.*  Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

129.   *Rule 23(b)(1)(B) Requirements.*  Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

130.   *Other Rule 23(b) Requirements.*  Class action status is also warranted under the other subsections of Rule 23(b) because: (a) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (b) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby

1   making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect

2   to the Class as a whole; and (c) questions of law or fact common to members of the Class

3   predominate over any questions affecting only individual members, and a class action is superior

4   to the other available methods for the fair and efficient adjudication of this controversy.

5   **PRAYER FOR RELIEF**

6   WHEREFORE, Plaintiff prays for:

7   A.     A Declaration that Defendants, and each of them, have breached their ERISA

8   fiduciary duties to the participants;

9   B.     An Order compelling Defendants to make good to the Plan all losses to the Plan

10  resulting from Defendants' breaches of their fiduciary duties, including loss of vested benefits to

11  the Plan resulting from imprudent investment of the Plan's assets; to restore to the Plan all profits

12  the Defendants made through use of the Plan's assets; and to restore to the Plan all profits which

13  the Plan and participants would have made if Defendants had fulfilled their fiduciary obligations;

14  C.     Imposition of a constructive trust on any amounts by which any Defendant was

15  unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

16  D.     An Order enjoining Defendants, and each of them, from any further violations of

17  their ERISA fiduciary obligation;

18  E.     An Order requiring Defendants to appoint one or more independent fiduciaries to

19  participate in the management of the Plan's investment in Company Stock;

20  F.     Actual damages in the amount of any losses the Plan suffered, to be allocated

21  among the participants' individual accounts in proportion to the accounts' losses;

22  G.     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

23  H.     An Order awarding attorneys' fees pursuant to the common fund doctrine, 29

24  U.S.C. § 1132(g), and other applicable law; and

25  I.     An Order for equitable restitution and other appropriate equitable and injunctive

26  relief against the Defendants.

27

28

1   Dated:  December 10, 2012

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BRAMSON, PLUTZIK, MAHLER
& BIRKHAEUSER LLP

By:  _____
Alan R. Plutzik (Cal. Bar No. 077785)
aplutzik@bramsonplutzik.com
2125 Oak Grove Rd., Suite 120
Walnut Creek, CA 94598
Telephone: (925) 945-0200
Facsimile:  (925) 945-8792


IZARD NOBEL LLP
Robert A. Izard
rizard@izardnobel.com
Mark P. Kindall (Cal. Bar No. 138703)
mkindall@izardnobel.com
29 South Main Street, Suite 215
West Hartford, CT 06107
Telephone: (860) 493-6292
Facsimile:  (860) 493-6290

HARWOOD FEFFER LLP
Robert I. Harwood
rharwood@hfesq.com
James G. Flynn
jflynn@hfesq.com
Tanya Korkhov
tkorkhov@hfesq.com
488 Madison Avenue
New York, NY 10022
Telephone: (212) 935-7400
Facsimile: (212) 753-3630

*Attorneys for Plaintiff Ruben Romero
and the Class*

COMPLAINT UNDER THE EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA) FOR BREACH OF FIDUCIARY DUTY